# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br><br>All computers, external hard drives, cell phones, tablets, DVDs, CDs, routers, cameras, videos recorders, floppy disks, zip drives, SD cards, VHS tapes, cassette tapes, slides, and other media and electronic storage devices, held in evidence and associated with Homeland Security Investigations (HSI) case 2S07QS212S0006, currently stored in the HSI Evidence Room in Greeley, Colorado and more fully described in Attachment A, attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   21-sw-01054-STV |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    **X** evidence of a crime;

    **X** contraband, fruits of crime, or other items illegally possessed;

    **X** property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. §§ 2251, 2252, 2252A, and 2423, and the application is based on these facts:

    **X** Continued on the attached affidavit, which is incorporated by reference.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

                                *s/*     *Darrell Franklin*        .
                                        *Applicant's signature*

                        Darrell Franklin, Special Agent, HSI
                                 *Printed name and title*

Sworn to before me and:     ☐ signed in my presence.
                         ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  October 5, 2021                                   
                                        *Judge's signature*

City and state:  ___Denver, CO___              Scott T. Varholak, U.S. Magistrate Judge
                                          *Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

All computers, external hard drives, cell phones, tablets, DVDs, CDs, routers, cameras, videos recorders, floppy disks, zip drives, SD cards, VHS tapes, cassette tapes, slides, and other media and electronic storage devices listed below (hereinafter and in Attachment B, the "Device(s)"), currently being held in association with HSI case 2S07QS212S0006 at the HSI Evidence Room, 4645 W. 18th Street, Suite 500, Greeley, Colorado, 80634.

**Item # / Description / Model #**
L21026535 / Dell Computer Tower
L21026536 / EXTERNAL HARD DRIVE / ZFL0H55E
L21026537 / EXTERNAL HARD DRIVE / ZFL0H024
L21026538 / SONY VAIO LAPTOP/ 283602303510876
L21026539 / EXTERNAL HARD DRIVE / MH0URZ5B
L21026540 / EXTERNAL HARD DRIVE / HD0D7UMC
L21026541 / EXTERNAL HARD DRIVE /17182153041600556
L21026542 / EXTERNAL HARD DRIVE / MS1JK5EK
L21026543 / EXTERNAL HARD DRIVE / Z4Z7023N
L21026544 / EXTERNAL HARD DRIVE / 2CAV03ZP
L21026546 SONY VAIO LAPTOP / 275449353000540
L21026548 / EXTERNAL HARD DRIVE / UNKSN
L21026550 / EXTERNAL HARD DRIVE / L600DQKG
L21026552 / EXTERNAL HARD DRIVE / 01121362
L21026554 / EXTERNAL HARD DRIVE / S03WJ10X422664
L21026555 / EXTERNAL HARD DRIVE / UNK
L21026557 / EXTERNAL HARD DRIVE / D5CA6ZWA
L21026558 / EXTERNAL HARD DRIVE / TB04W67C
L21026561 / EXTERNAL HARD DRIVE MISC BOX COMPUTER ITEMS IN BOX
L21026562 / EXTERNAL HARD DRIVE / 71GPD13VB
L21026563 / EXTERNAL HARD DRIVE / W4Z49KEZ
L21026564 / EXTERNAL HARD DRIVE / Z4Z0F9HP
L21026566 / EXTERNAL HARD DRIVE / WCC4MFDV2UYS
L21026568 / PANASONIC TOUGHBOOK / 0045675249072
L21026570 / EXTERNAL HARD DRIVE / K80JS3MC
L21026571 / EXTERNAL HARD DRIVE / 17182153041600557

1

L21026572 / EXTERNAL HARD DRIVE / Y306VV9E

L21026574 / SAMSUNG CELL PHONE / R38JB0JPRXU

L21026575 / SAMSUNG GALAXY TABLET / R52JALMF1GR

L21026576 / BLK ANDRIOD CELL PHONE / KTU84PM919UVST9A1

L21026578 / SAMSUNG CELL PHONE / SGHTG99

L21028092 / MAXTOR HARD DRIVE / 664204801501

L21028093 / MAXTOR HARD DRIVE / K80JH7RC

L21028094 / MAXTOR HARD DRIVE / K80FNLAC

L21028095 / MAXTOR HARD DRIVE / K60BA01C

L21028097 / IBM DESKSTAR HARD DRIVE / A4CUYE0A

L21028104 / LG CD/DVD CASES

L21028105 / CD/DVDS

L21028108 / 2XMED CD/DVD CASES

L21028118 / ROKU 4660X2 ROKU ROUTER / CK48A5690084

L21028119 / LG SPINDLE CD/DVDS

L21028121 / SM SPINDLE CD/DVDS

L21028123 / MED CD/DVD CASE

L21028124 / SM SPINDLE CD/DVDS

L21028126 / CD/DVDS

L21028128 / CD/DVDS

L21028132 / DVDS

L21028134 / PANASONIC DC-ZS80-PANASONIC DIGITAL CAMERA / WS0AA002362

L21028135 / ORICO HARDDRIVE ENCLOSURE

L21028136 / SEAGATE HARD DRIVE / ZCT2XJYX

L21028137 / SEAGATE HARD DRIVE / ZCT2X7EC

L21028139 / 2XDVDS

L21028140 / SONY REWRITABLE DRIVE

L21028142 / MOTHER BOARDS

L21028143 / RAM /

L21028145 / MED SPINDLE CD/DVDS

L21028146 / MULT FLOPPY DISCS

L21028147 / BOX W/FLOPPY DISCS

L21028148 / SM CD/DVD CASE

L21028149 / ZIP DRIVE AND 2 CASES

L21028152 / ZIP DRIVES

L21028153 / IOMEGA ZIP WRITER / SSB62430H4

L21028157 / IOMEGA DISKS

L21028159 / OLYMPUS CAMERA / 4021668

L21028160 / SD CARDS

L21028164 / VHS TAPES

2

L21028166 / MAXTOR HARD DRIVE / L603FACH
L21028168 / MAXTOR HARD DRIVE / L40YW48G
L21028170 / ZIP DRIVES
L21028172 / VIDEO MINI CASSETTES
L21028173 / COMPUTER PARTS
L21028174 / CD/DVDS
L21028175 / SONY SUPER STEADY SHOT / 41480
L21028176 / SONY CAMERA / 0845489
L21028178 / SONY CYBER SHOT CAMERA / 1092092
L21028179 / SONY CYBER SHOT VIDEO CAMERA / 1432374
L21028180 / SD CARDS AND CAMERA ACCESSORIES
L21028181 / CD/DVDS IN HARD CASE
L21028182 / MED SPINDLES CD/DVDS
L21028183 / CD/DVDS
L21028184 / 2 BOXES OF FLOPPY DISKS
L21028187 / VHS TAPES IN BOX
L21029380 / DISC- RECORDING
L21029382 / DISC- RECORDING
L21029791 / BLUE TOTE-SLIDES, VIEWER, PICTURES
L21029793 / BLUE TOTE-SLIDES, SLIDE SORTER

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections 2251(a), (c) and (e); 2252(a)(1) and (4); 2252A(a)(1) and (5); and 2423(a), (b), and (c) (hereinafter "Subject Offenses"):

1. Images or visual depictions of child pornography;

2. Records and information containing child erotica, including texts, images and visual depictions of child erotica;

3. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

4. Any and all information, notes, documents, records, or correspondence, in any format or medium, pertaining to child pornography or sexual activity with or sexual interest in minors;

5. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning Internet activity reflecting a sexual interest in minors or child pornography;

6. Any and all information, notes, software, documents, records, or correspondence, in any form and medium pertaining to any minor who is, or appears to be, the subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minors;

7. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of the Subject Offenses;

8. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography;

9. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of the Subject Offenses;

10. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of the Subject Offenses;

11. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of the Subject Offenses or that show who used, owned, possessed, or controlled the Device(s);

12. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of the Subject Offenses;

13. Credit card information, bills, and payment records pertaining to violations of the Subject Offenses;

14. Information about usernames or any online accounts or email addresses that include andywww@earthlink.net, andywww@lysva.com or bl_a@tutanota.com;

15. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

16. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence;

17. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software;

18. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

19. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

20. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

21. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s);

22. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

23. Contextual information necessary to understand the evidence described in this attachment and;

24. Any and all information, documents, records, photos, receipts, telephone bills, or correspondence, in any format or medium, pertaining to Andrew WILSON or James STAPP's international and interstate travel.

DEFINITIONS:

25. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any

handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

26. "Child Pornography" is defined in 18 U.S.C. § 2256(8), which includes as any visual depiction of sexually explicit conduct involving the use of a minor; a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaged in sexually explicit conduct; or a visual depiction that has been created, adapted, or modified to appear than an identifiable minor is engaging in sexually explicit conduct.

27. "Visual depiction" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

28. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

29. "Illicit sexual conduct" is defined by 18 U.S.C. § 2423(f) to include a sexual act with a minor under 18 years old, a commercial sex act with a minor under 18 years old, or the production of child pornography.

## AFFIDAVIT

I, Darrell Franklin, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) and have been since February of 2007. I am currently assigned to the HSI office in Greeley, Colorado. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, 2252A and 2423.  I have received training and instruction in the field of investigation of child pornography and have had the opportunity to participate in investigations relating to the sexual exploitation of children.  As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for computers and related equipment (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251(a), (c) and (e); 2252(a)(1) and (4); 2252A(a)(1) and (5); and 2423(a), (b), and (c).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251, 2252,2252A, and 2423 are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. Sections 2251, 2252,2252A, and 2423, relating to material involving the sexual exploitation of minors.

6. 18 U.S.C. Section 2251(a) and (e) prohibits a person from employing, using, persuading, inducing, enticing or coercing a minor to engage in any sexually explicit conduct (child pornography) for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, or attempting to do so.

7. 18 U.S.C. Sections 2252 and 2252A prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as transporting, receiving, distributing or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography).

8. 18 U.S.C. Section 2423 prohibits a person from knowingly transporting a minor in interstate or foreign commerce with the intent that the minor engage in criminal sexual activity, traveling in

interstate or foreign commerce for the purpose of engaging in illicit sexual conduct, or traveling in foreign commerce or residing in a foreign country and engaging in illicit sexual conduct if the actor is a United States citizen.

## DEFINITIONS

9. The following definitions apply to this Affidavit and Attachment B to this Affidavit.

10. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

11. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

12. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

13. "Illicit sexual conduct" is defined by 18 U.S.C. § 2423(f) to include a sexual act with a minor under 18 years old, a commercial sex act with a minor under 18 years old, or the production of child pornography.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

14. Several items are held in evidence at the HSI Evidence Room in Greeley, Colorado, which were seized pursuant to a search warrant. They are all being held in evidence under case number 2S07QS212S0006. The items include the following, hereinafter and in Attachments A and B the "Device(s)":

    a) L21026535 / Dell Computer Tower
    b) L21026536 / EXTERNAL HARD DRIVE / ZFL0H55E
    c) L21026537 / EXTERNAL HARD DRIVE / ZFL0H024
    d) L21026538 / SONY VAIO LAPTOP/ 283602303510876
    e) L21026539 / EXTERNAL HARD DRIVE / MH0URZ5B
    f) L21026540 / EXTERNAL HARD DRIVE / HD0D7UMC
    g) L21026541 / EXTERNAL HARD DRIVE /17182153041600556
    h) L21026542 / EXTERNAL HARD DRIVE / MS1JK5EK
    i) L21026543 / EXTERNAL HARD DRIVE / Z4Z7023N
    j) L21026544 / EXTERNAL HARD DRIVE / 2CAV03ZP
    k) L21026546 SONY VAIO LAPTOP / 275449353000540
    l) L21026548 / EXTERNAL HARD DRIVE / UNKSN
    m) L21026550 / EXTERNAL HARD DRIVE / L600DQKG
    n) L21026552 / EXTERNAL HARD DRIVE / 01121362
    o) L21026554 / EXTERNAL HARD DRIVE / S03WJ10X422664

p) L21026555 / EXTERNAL HARD DRIVE / UNK
q) L21026557 / EXTERNAL HARD DRIVE / D5CA6ZWA
r) L21026558 / EXTERNAL HARD DRIVE / TB04W67C
s) L21026561 / EXTERNAL HARD DRIVE MISC BOX COMPUTER ITEMS IN BOX
t) L21026562 / EXTERNAL HARD DRIVE / 71GPD13VB
u) L21026563 / EXTERNAL HARD DRIVE / W4Z49KEZ
v) L21026564 / EXTERNAL HARD DRIVE / Z4Z0F9HP
w) L21026566 / EXTERNAL HARD DRIVE / WCC4MFDV2UYS
x) L21026568 / PANASONIC TOUGHBOOK / 00045675249072
y) L21026570 / EXTERNAL HARD DRIVE / K80JS3MC
z) L21026571 / EXTERNAL HARD DRIVE / 17182153041600557
aa) L21026572 / EXTERNAL HARD DRIVE / Y306VV9E
bb) L21026574 / SAMSUNG CELL PHONE / R38JB0JPRXU
cc) L21026575 / SAMSUNG GALAXY TABLET / R52JALMF1GR
dd) L21026576 / BLK ANDRIOD CELL PHONE / KTU84PM919UVST9A1
ee) L21026578 / SAMSUNG CELL PHONE / SGHTG99
ff) L21028092 / MAXTOR HARD DRIVE / 664204601501
gg) L21028093 / MAXTOR HARD DRIVE / K80JH7RC
hh) L21028094 / MAXTOR HARD DRIVE / K80FNLAC
ii) L21028095 / MAXTOR HARD DRIVE / K60BA01C
jj) L21028097 / IBM DESKSTAR HARD DRIVE / A4CUYE0A
kk) L21028104 / LG CD/DVD CASES
ll) L21028105 / CD/DVDS
mm) L21028108 / 2XMED CD/DVD CASES
nn) L21028118 / ROKU 4660X2 ROKU ROUTER / CK48A5690084
oo) L21028119 / LG SPINDLE CD/DVDS
pp) L21028121 / SM SPINDLE CD/DVDS
qq) L21028123 / MED CD/DVD CASE
rr) L21028124 / SM SPINDLE CD/DVDS
ss) L21028126 / CD/DVDS
tt) L21028128 / CD/DVDS
uu) L21028132 / DVDS
vv) L21028134 / PANASONIC DC-ZS80-PANASONIC DIGITAL CAMERA / WS0AA002362
ww) L21028135 / ORICO HARDDRIVE ENCLOSURE
xx) L21028136 / SEAGATE HARD DRIVE / ZCT2XJYX
yy) L21028137 / SEAGATE HARD DRIVE / ZCT2X7EC
zz) L21028139 / 2XDVDS
aaa) L21028140 / SONY REWRITABLE DRIVE
bbb) L21028142 / MOTHER BOARDS
ccc) L21028143 / RAM /
ddd) L21028145 / MED SPINDLE CD/DVDS
eee) L21028146 / MULT FLOPPY DISCS
fff) L21028147 / BOX W/FLOPPY DISCS
ggg) L21028148 / SM CD/DVD CASE

3

hhh)    L21028149 / ZIP DRIVE AND 2 CASES
iii)    L21028152 / ZIP DRIVES
jjj)    L21028153 / IOMEGA ZIP WRITER / SSB62430H4
kkk)    L21028157 / IOMEGA DISKS
lll)    L21028159 / OLYMPUS CAMERA / 4021668
mmm)    L21028160 / SD CARDS
nnn)    L21028164 / VHS TAPES
ooo)    L21028166 / MAXTOR HARD DRIVE / L603FACH
ppp)    L21028168 / MAXTOR HARD DRIVE / L40YW48G
qqq)    L21028170 / ZIP DRIVES
rrr)    L21028172 / VIDEO MINI CASSETTES
sss)    L21028173 / COMPUTER PARTS
ttt)    L21028174 / CD/DVDS
uuu)    L21028175 / SONY SUPER STEADY SHOT / 41480
vvv)    L21028176 / SONY CAMERA / 0845489
www)    L21028178 / SONY CYBER SHOT CAMERA / 1092092
xxx)    L21028179 / SONY CYBER SHOT VIDEO CAMERA / 1432374
yyy)    L21028180 / SD CARDS AND CAMERA ACCESSORIES
zzz)    L21028181 / CD/DVDS IN HARD CASE
aaaa)    L21028182 / MED SPINDLES CD/DVDS
bbbb)    L21028183 / CD/DVDS
cccc)    L21028184 / 2 BOXES OF FLOPPY DISKS
dddd)    L21028187 / VHS TAPES IN BOX
eeee)    L21029380 / DISC- RECORDING
ffff)    L21029382 / DISC- RECORDING
gggg)    L21029791 / BLUE TOTE-SLIDES, VIEWER, PICTURES
hhhh)    L21029793 / BLUE TOTE-SLIDES, SLIDE SORTER

15. Your Affiant believes there is probable cause to believe that the Device(s) are or contain evidence, fruits, and instrumentalities of violations of 2251(a), (c) and (e); 2252(a)(1) and (4); 2252A(a)(1) and (5); and 2423(a), (b), and (c).  The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

16. The Device(s) are currently in the lawful possession of the HSI.  They came into the HSI's possession in the following way: On July 22, 2021, the Lakewood Police Department (LPD) executed a state search warrant at Andrew WILSON's residence located at 1355 Otis Street in Lakewood, Colorado.[1] LPD Detective Kimberly Collins conducted a post-Miranda interview of WILSON. WILSON admitted that he possessed numerous computers and electronic storage devices inside his residence containing child pornography images that he either produced or downloaded from the Internet. WILSON admitted that he produced child pornography images in Acapulco, Mexico in 2002 using his video camera and digital camera, and that he had sex (oral or manual) ten

---

[1] LPD began searching the devices they recovered from WILSON's home as authorized by the search warrant. This search included previewing the contents of some devices during the execution of the search warrant at WILSON's home. Some of the devices recovered have also been subsequently forensically searched. This application does not rely on any information or material recovered from the search of these devices.

to twelve times with four to five boys. WILSON further admitted to producing child pornography that included WILSON engaged in sexual activity with a then-13-year-old boy in Mexico who he later smuggled into the United States in order to continue engaging in sexual activity with him. Therefore, while your Affiant might already have all necessary authority to examine the Device(s), your Affiant seeks this additional search warrant out of an abundance of caution to be certain that an examination of the Device(s) will comply with the Fourth Amendment and other applicable laws.

17. The Device(s) are currently in storage at the HSI Evidence Room at 4645 W. 18th Street, Suite 500, Greeley, Colorado, 80634. In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device(s) first came into the possession of the HSI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

19. A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable digital storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards and miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages. If the camera is equipped with global positioning system ("GPS") technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created. Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

20. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards

will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

21. A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

22. A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

23. A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

24. A hard disk drive ("HDD"), also known as a hard drive or hard disk, is a data storage device that consists of an external circuit board, external data, power connections, and internal glass, ceramic, or magnetically charged rotating metal platters that permanently store data even when powered off. A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters. Flash drives, flash cards, and thumb drives are digital storage devices that can connect to computers or other devices using the appropriate connection. CDs/DVDs are digital storage devices capable of storing large amounts of digital data—a user can store information onto a CD/DVD by "burning" digital data to the device using a computer CD/DVD drive. These devices are capable of storing

any electronic information including images, videos, word processing documents, programs and software, and web pages.

25. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

26. Computer routers and modems are also used as instrumentalities of crimes involving computers both to operate the computer to commit criminal offenses involving the sexual exploitation of minors.  Modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet, and some have separate digital storage capacity that allow them to connect to other devices and to store information similar to an external digital storage device like a flash card or thumb drive.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device or the computers and devices connected to it.

27. VHS (Video Home System), most known as VHS tapes and VHS cassettes is a standard for consumer-level analog video recordings. VHS utilizes magnetic tape to produce video recordings which are stored on a reel of tape enclosed within a plastic housing. VHS tapes and VHS cassettes can be viewed in machines called videocassette recorders (VCRs).

28. "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

29. Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

30. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

31. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage

device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

B.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.   Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

D.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

32. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when. There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

A.   Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.   A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.   The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F.   Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, particularly crimes involving the sexual exploitation of children, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.

G.   Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

H.   A single compact disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Thumb drives with a capacity of 32 gigabytes are not uncommon.  Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon.  These drives can store thousands of images and videos at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

33.   *Need to review evidence over time and to maintain entirety of evidence.*  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is

content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

34. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

35. Your Affiant knows from training and experience that seized computers may contain communications to/from an attorney. If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## INVESTIGATION

### Introduction

36. On January 31, 2020, the Washoe County Sheriff's Office in Nevada received a report alleging that James Robert STAPP (DOB 12/9/47) sexually assaulted a 12-year-old boy who was his non-

biological grandchild. During the investigation that followed, Detective Joey Lear of the Washoe County Sheriff's Office learned that STAPP had lived in Lakewood, Colorado in the early 2000's with Andrew Lane WILSON (DOB 10/25/51) at the possible address of 2080 Moore Street. The investigation revealed allegations that both STAPP and WILSON sexually abused minor children at their home in Colorado and moved together to Mexico where they continued to sexually abuse minor children and produced child pornography. WILSON subsequently returned to the United States, and he assisted with smuggling a minor boy from Mexico to continue sexually abusing him in Colorado. STAPP moved to Nevada after returning to the United States. Det. Lear requested assistance from Lakewood Police Department Detective Kimberly Collins on February 17, 2021.

37. Det. Collins' investigation in Colorado included interviewing WILSON and executing a search warrant at his home, which authorized the seizure of numerous electronic devices which are the subject of this application. On July 17, 2021 when the search warrant was executed at his home, WILSON was arrested by Lakewood Police Department. He was charged with Sexual Exploitation of a child for the possession of child pornography and subsequently detained on $2 million bond. That case is currently pending in Jefferson County, Colorado and is next scheduled in court on November 16, 2021.

38. On December 22, 2020, STAPP was arrested and charged in Washoe County, Nevada with three counts of Lewdness by a Person over 18 with a Child Less than 14 for the sexual assault of his 12-year-old non-biological grandson. To date, he has plead guilty to the charges and is scheduled to be sentenced on November 4, 2021.

*A.H.*

39. On January 31, 2020, a report was made to the Washoe County Sheriff's Office in Nevada about STAPP sexually assaulting a 12-year-old non-biological grandchild. The mother of this child was A.H.

40. A.H. was interviewed on June 23, 2020, by Det. Kimberly Frankel of the Washoe County Sheriff's Office and A.H. disclosed the following information. A.H. is biologically female but in approximately 1999, she was posed as a boy/male online where she met STAPP. After September 11, 2001, A.H. and STAPP moved together to Lakewood, Colorado where they lived with Andrew WILSON in WILSON's home. A.H. described being in an intimate relationship with STAPP in 2001. She said the intimacy would involve foreplay where A.H. would tell STAPP about fictional explicit stories about men and boys.

41. A.H. said that at some point she found a listing for STAPP with Northern American Man/Boy Love Association (NAMBLA) with a mailing list of STAPP's previous mailing address in Chicago: Bobb STAPP 2372 S Goebbert Road, Arlington Heights, Illinois 60005.

42. A.H. described that both STAPP and WILSON had child pornography in the home they all shared in Lakewood, Colorado. A.H. described STAPP's pornography to include child pornography, bestiality, and adult pornography. She said none of the images that she observed included STAPP in the image. WILSON had an office in the home, and A.H. walked in on WILSON, "indecent" with child pornography on his computer.

43. A.H. remembered STAPP told her about a time he was "terrified" because his computer was confiscated at an airport. A.H. couldn't remember what brought the discussion up, or what airport this took place at. STAPP told A.H. he had images on his computer. None of the images had his

picture in them, but it was described as "pornography". A.H. believes STAPP was on his way home when his computer was seized[2].

44. On 3/3/21, Det. Lear spoke with A.H. again. A.H. admitted to walking in on Andy WILSON in his office and seeing him watch graphic sexual videos of young boys. A.H. looked on WILSON's computer when he was out shopping early in the morning. She admitted to seeing thousands of graphic sexual images of young boys. She also saw videos of WILSON committing sexual abuse on young boys.

45. A.H. explained that a young blond haired 10/11-year-old boy lived next door to Andy WILSON. A.H. provided information about this boy sufficient for Det. Lear to identify him as S.K. A.H. said WILSON and S.K. were inseparable. He would come over before and after school, would sit on WILSON's lap and watch TV. They would play catch and wrestle all the time. WILSON wouldn't let A.H. talk to S.K. or be alone with him. A.H. saw S.K. in WILSON's office near the computer which contained porn and in WILSON's bedroom. She believed WILSON was in a sexual relationship with S.K.

46. On 03/09/21, Det. Collins called A.H., who informed her of the following additional information. WILSON kept to himself. He worked for Outward Bound in Denver. He would start at 5 in the morning. He was an "odd bird". She didn't interact with him much because she didn't like him. WILSON had an office with approximately four to five computers set up. He had a printer. She said they were all desktop computers. She wasn't allowed in WILSON's office. She had a computer and doesn't remember if STAPP had one.

47. A.H. had observed some photos and videos on WILSON's computer. She had gone in to talk to WILSON and he was in his office and the door was closed. She walked in and he was watching some "interactions" on the computer with young boys. She got really uncomfortable with that. The boys were engaged in sexual activity and were about 7 or 8. She said the video wasn't in English. The boys were Russian or something. They were white but speaking in another language. WILSON was masturbating. He got really angry and yelled at her. She wasn't in the room long when that happened. He liked to go to the store, so she went into his office when he was gone. She looked at his computer and there was a lot of that on his computer. She said there were photos and videos of boys from Russia, the Philippines, and Mexico. WILSON was in a video she saw with a little boy approximately 11 years old who spoke Spanish. WILSON called him over and was kissing the boy. The boy and WILSON were naked. She thinks it was filmed in Mexico because WILSON and STAPP took frequent trips to Mexico. She said there was a lot of videos on the computer. She said it was obvious to find the videos on the computer and WILSON had previously lived by himself. She was in there 15-20 minutes looking at his computer that was in front of the window. She doesn't remember there being a password. They had screensavers and they were always on. WILSON did have a laptop that he brought onto the counter with STAPP. She remembers him doing that and thinking that was cool because they weren't common in her experience. WILSON was a techy guy. Shortly after A.H. left, WILSON and STAPP went to Acapulco to start a VOIP internet café. STAPP was going to buy play stations and whatnot. STAPP came back early, and they cut ties after that.

48. Det. Collins asked A.H. if WILSON ever touched S.K. sexually to her knowledge. She said she wasn't sure what that means. She observed S.K. sitting on WILSON's lap and rubbing hands down his back, on his butt, rub his thighs, and rub his feet. They would wrestle and cuddle in the living

---

[2] Your affiant located DHS Incident Report# 20062801000560 which documented an incident on June 2, 2006, where James STAPP was encountered by CBP when he arrived at San Francisco International Airport from Frankfurt, Germany. Based on pictures of young boys (non-nude) viewed on STAPP's laptop and his previous arrest involving sexual acts with a minor, STAPP's laptop was detained for examination.

room. S.K. would be in WILSON's lap or WILSON would sit behind him playing games. WILSON never had any adult guys that he had a relationship with. WILSON would be playing with S.K. in his office or room or in the backyard. Most of the time when he wasn't working, he was with S.K. She never saw S.K.'s parents. She lived with WILSON about 6 months to a year. She never saw any friends of WILSON's come over. She wasn't sure about WILSON's sexuality.

49. WILSON told A.H. that when he went to Lima, Peru, the windows that were blue were boys he could rent and the curtains that were pink were for girls. She thinks he paid kids for sex because you don't just come by that information. She felt it took some personal experience. WILSON told A.H. that in Mexico, they pay you to bring children to the US. They would sell you a little boy or girl in hopes you bring them to a better life. She thought there was a sexual component to that because no one with good intentions would bring anyone here. He would talk about street kids in Mexico and how sad it was they lived on the beaches. He would talk about some of the kids he met down there. WILSON spoke to A.H. about some of the same kids in Mexico as STAPP spoke of, including a 12 or 13-year-old boy J.D. with whom STAPP had an ongoing sexual relationship.

50. Det. Collins asked A.H. what WILSON talked about with J.D. He talked about taking him places and J.D.'s family. They took him places to parks and beaches. WILSON would talk about how the homeless kids in Mexico would follow you back to where you were staying. He talked about bribing police and give them money and they'll turn the other way. She saw his normal vacation pictures and other kids WILSON had taken various places that were normal photos. She thought it was nice of him.

51. STAPP told her about S.K. coming over a lot. He said WILSON was quiet, and to himself, which A.H. also observed. STAPP said he was his good friend and they knew each other for a long time. STAPP spent time with WILSON on WILSON's computer.

52. A.H. told Det. Collins that while she was living with WILSON and STAPP, STAPP had a relationship with a 17-year-old boy C.S. C.S. lived in the house with STAPP, WILSON, and A.H. for a while then he left on his own.

53. A.H. told Det. Collins that she had overhead STAPP and WILSON talking about pictures WILSON had, and an online group that WILSON belonged to which required him to post pictures to gain membership. She said it was like a bulletin board with a list of links. She saw it on his computer, and she saw WILSON use it before. She hadn't seen pictures but lists of different files. He would turn it off really quick by closing the laptop or clicking onto another screen.

54. According to A.H., STAPP would have nothing to do with WILSON after they returned from Mexico. It scared STAPP enough he came back. She doesn't know if they were being blackmailed. When he came back, STAPP was really upset. He said WILSON was stupid for staying in Mexico and if he was smart, he would come back and wouldn't go back to Mexico, and Acapulco isn't a safe. WILSON left his stuff in his house when he went to Mexico.

*Minor S.K.*

55. On 3/3/21, Det. Lear contacted S.K. by phone. S.K. confirmed WILSON was a "good friend" and that S.K. was the neighborhood boy who worked for everybody. S.K. says looking back he realizes STAPP and WILSON were probably gay and into young boys, although he wasn't sure why he thought that. S.K. denied they tried anything sexual with him. He once opened WILSON's laptop and saw "cock and balls" and closed it. He was about 7-13 years old when he knew WILSON until WILSON moved to Mexico with STAPP to start the Internet Café.

56. On 03/09/21, Det. Collins went to interview S.K. He lived two doors down from where Andy WILSON and Bob STAPP lived at 2080 Moore Street back in 2001. S.K. was a neighborhood kid

who spent a lot of time with Andy WILSON when S.K. was 7-13 years old. S.K. recapped that he spent time at WILSON's house doing odd jobs and playing on his computers. S.K. said WILSON worked with computers and there were computers in almost every room of his house. He said WILSON did have an office where he had a laptop and a desk top computer. S.K. said WILSON fixes and tinkers with hard drives often. S.K. also saw a few cameras and video cameras. He believed S.K. took those with him on his outdoors trips to Utah. S.K. knew that Bob STAPP was with a woman (A.H.). He played computer games with A.H. a lot. S.K. could tell WILSON and STAPP were gay and into each other.

57.  One incident S.K. recalled was opening the laptop in WILSON's office and there was male on male sex acts of pornography on the screen. He said he shut it right away and the image was burned in his memory, but he was unsure how old the males were in the pornography he saw. After he shut the laptop, he ran to his basement, then went and told a friend what he saw. Det. Collins asked if WILSON ever taught S.K. about computers, and he said he did not. Det. Collins asked why A.H. has concerns that more happened sexually with WILSON and S.K. continued to deny it. S.K. somewhat remembered a teen boy with STAPP that could have been C.S. S.K. knew that WILSON moved to Acapulco to start the Internet Café. He said somehow, he found WILSON's phone number and contacted WILSON about 12 years ago when WILSON moved back to Colorado and into the apartments. IS.K. didn't see other kids at WILSON's ever.

*Victim C.S.*

58.  Det. Lear interviewed C.S. C.S. stated he was 16 years old when STAPP encouraged him to move from New Mexico to Colorado into the Lakewood house. C.S. stated that during this time, he worked with STAPP and WILSON at Colorado Outward Bound; that STAPP and WILSON had over a terabyte of child pornography in their home; that WILSON educated him on how to find, download, and categorize child pornography; and that some of the child pornography was self-produced by STAPP and WILSON on their annual trip to Mexico.

59.  On February 25, 2021, Det. Collins reviewed an FBI case involving the interview of C.S. in 2006 when C.S. had been arrested for child pornography related charges.[3] According to the records of that interview, in early 2002, C.S. developed a relationship on the Internet with then-54-year-old STAPP. STAPP convinced C.S. to move to Denver, Colorado to seek a job at "Colorado Outward Bound" as a logistics coordinator (C.S. would have been 17 years old at this time, turning 18 in July). C.S. said that in the residence he shared with SAPP there were three computers and a main server which collected a large amount of child pornography. Another male named Andy (WILSON) and female (A.H.) also lived at the house. A.H. got married and moved out during the time that C.S. was there. While living there, C.S. viewed a lot of child pornography. He believed that STAPP only collected and did not distribute child pornography. STAPP and C.S. did not have a sexual relationship. It was understood that the child pornography should not be talked about.

60.  On February 2, 2021, Det. Lear interviewed C.S. in more depth. C.S. confirmed that he and STAPP were both members of an online forum called www.boybliss.net and the "bliss" portion stands for "Boy Lovers International Support Society". C.S. was around 15 or 16 when he joined the website due to being a closeted young gay male. C.S. asked STAPP at one point if STAPP had ever had sex with an underage boy to which STAPP replied, "There's nothing better than burying your face in a small hairless pubis." STAPP had C.S. apply for Colorado Outward Bound and lie to say he was 18

---

[3] On March 23, 2006, C.S. was arrested and charged with Sexual Exploitation of Children, Distribute, Possess Media of Child under 18 in Los Alamos, New Mexico. He was convicted of the felony of Sexual Exploitation of a Child and on March 3, 2008, he was sentenced to one year of supervised probation, from which he was satisfactorily discharged on March 3, 2009.

years old. C.S. got the position and worked there from May 2002 to September 2002. C.S. said he often stayed at Andy WILSON's house at 2080 Moore Street, Lakewood CO.

61. At WILSON's house STAPP introduced C.S. to the advanced "porn tower" set up. C.S. described the tower as the first terabyte of child pornography he ever saw and believed the tower belonged to WILSON. STAPP and WILSON were both actively downloading, compiling, and categorizing the "massive" amount of child pornography in the form of videos and pictures. STAPP taught C.S. how to access the news groups that would distribute stories and files. A specific program could stitch the stories and files back together after they were downloaded.

62. STAPP showed C.S. a video of himself from a trip to Acapulco. There were two 11 to 12-year-old boys wrestling and tickling each other. STAPP was in the video naked with a partial erection. WILSON was naked as well in the video. STAPP may have grabbed the child's buttocks.

63. C.S. described WILSON's tower of child pornography as mainly having content of male children between 10 to 16 years old. STAPP would view the child pornography with C.S. and encourage C.S. to spend alone time with it. C.S. saw STAPP masturbating to the child pornography on a few occasions. STAPP talked to C.S. about two other boys he sexually assaulted with limited information. C.S. told Det. Lear that WILSON and STAPP left Colorado Outward Bound in 2002 to move to Acapulco Mexico to start the Internet Café. STAPP had connections with the locals which resulted in boys being provided to him. STAPP called them "beach orphans" or "beach urchins" and STAPP could pay money in exchange for sex. STAPP would pick up pubescent boys and pay for sex. STAPP took annual trips to Mexico and had one specific boy he met with named J.D. Their contacts started when J.D. would have been about 12 or 13-year-old.

*Victim J.A.G.V.*

64. On 7/27/21, Det. Collins called J.A.G.V., who is the boy WILSON brought from Mexico to Colorado. J.A.G.V. primarily spoke Spanish and Det. Hernandez of the Lakewood Police Department interviewed him in Spanish. J.A.G.V. denied any photos were taken of him or any sex acts happened with WILSON. He said he wouldn't want to get someone in trouble that never did anything bad to him.

65. On 7/29/21, DHS records revealed the following information for J.A.G.V.:

   A. 01/27/2006- Arrested by ICE Denver from the Jefferson County Jail after being arrested for a Disobeying Police charge. Removed to Mexico on 02/07/2006;

   B. 09/24/2020- Arrested by Border Patrol near San Diego, CA. Removed to Mexico shortly after this arrest. Lists a spouse.

   C. Based on his date of birth, J.A.G.V. was 18 years old in 2005 when WILSON says he paid coyotes to bring J.A.G.V. to Los Angeles.

*NCMEC*

66. On 2/17/21, Det. Collins e-mailed NCMEC for technical assistance to see if they had any reports related to WILSON. Det. Collins sent the following intelligence to have them cross reference Andrew Lane WILSON, DOB 10/25/51, 1355 Otis St Lakewood CO 80214, 2080 Moore St Lakewood CO 1786 Teller ST Apt 3C, Lakewood, CO 80214, 720-971-8722, andywww@earthlink.net.

67. In response, NCMEC provided information about a 2001 Cybertip #34242 from 1/11/2001 at 200:07:25 UTC for andywww@lysva.com about a website (http://eros.queans.com) that had

suspected child pornography linked to the email. The report says NCMEC accessed the URL and it was adult pornography. The sign up email was andywww@lysva.com.

### Prior criminal history of STAPP and WILSON

68. A search of law enforcement databases revealed no prior arrests for WILSON

69. A search of law enforcement databases showed that on March 10, 1982, STAPP was arrested in Minneapolis, Minnesota and charged with Criminal Sexual Conduct in the First Degree and Intrafamilial Sexual Abuse. On July 6, 1982, STAPP was sentenced to three years of probation following a conviction for the misdemeanor charge of Intrafamilial Sexual Abuse.

### Statement by STAPP when he was arrested in Nevada

70. On December 22, 2020, Washoe County Sheriff's Office arrested James STAPP for lewd acts to children relating to the 12-year-old non-biological grandchild and son of A.H. On that date, STAPP was interviewed. He waived his Miranda Rights, however, he said he would only talk up to a point without a lawyer. He confirmed that after 9/11/2001, that his friend Andy WILSON helped him get a new job as Chief Financial Officer with WILSON's company. They then decided to start a business in Mexico around 2002 to 2003. They started an Internet café and bookstore across the street from a cruise ship terminal. They had issues with an inspector at the municipality. He was given a list of fixes that required thousands of dollars in changes. If they didn't make the changes, they could pay the inspector directly. They gave up and moved back to Denver, CO.

71. When STAPP was arrested, he was in possession of a Nokia Cricket phone. The phone was seized as evidence. On 12/23/2020, Det. Det. Lear obtained a search warrant to search for data contained in STAPP's phone. During a search of the cell phone, Det. Lear was unable to find any contacts between STAPP and WILSON.

### WILSON's Home: 1355 Otis Street, Denver, Colorado

72. On 2/24/21, at approximately 1700 hours, LPD patrol agents drove past 1355 Otis Street, where WILSON has lived since 2013 and photographed the front of his house. They confirmed WILSON's 1988 Gray BMW Sedan Colorado License GCE8700 registered to WILSON was in his driveway.

73. On 3/1/21, Det. Collins used an undercover cell phone number to contact WILSON at his phone number: 720-971-8722. The following is the conversation:

> Det. Collins: Hey Jonny it's Jessie did you do the science hw
>
> WILSON: Wrong number
>
> Det. Collins: Fr? Damn sorry. I thought he gave me his number cuz he thot I was cute (face palm emoji)
>
> WILSON: Cool. Find his real number. I haven't done hw for 50 years. Have fun!
>
> Det. Collins: Yea idk maybe I read his vibes wrong. Ik. I'll never use n e of this.

74. Det. Collins requested WILSON's work history from the Department of Labor and asked for his work history dating back to 2000. They were able to give Det. Collins through January 2019. He worked for Lakewood Memory Care from 1-3/2019. He worked for Barnes Construction Company and 7395 W Eastman Place Operations LLC from about March 2019-= to April 2020.

75. Det. Collins ran a records search for WILSON and found the following cases:

    D. WRPD Reference number 2011-10241 – Andrew WILSON is listed as the on-site apartment manager at Elmwood Manor apartment complex 1700 block of Teller St.

    E. Lakewood PD LK14-039038– 9/21/14 Andrew WILSON reported someone broke into his detached garage at 1355 Otis Street. Two Canon Camera's with lenses were reported missing. Canon A-1 Camera and 50 mm lens $75-$100 (there are CSI photos of his detached garage. In the photos you can see boxes labeled, "Sony", "JVC", "Toshiba".

    F. LK17-051433 12/10/17 – WILSON was the victim of trespass of vehicle, items taken subwoofer and various items at 1355 Otis Street

    G. LK13-001264, 1/10/13 – witness (WILSON was the landlord to victim). Andrew witnessed a male stealing tenants rear license plates.

    *H.* LK12-017839 – 5/2/12 – manager of apartment complex

*Interview with Andrew WILSON on July 16, 2021*

76. On 7/16/21, Det. Russell and Det. Collins went to 1355 Otis Street, Lakewood, Jefferson County, Colorado to conduct a knock and talk with Andrew WILSON. Det. Collins didn't see anyone in the house, and no one answered the doorbell rings. As they walked away, Andrew WILSON drove up in his Gray 1988 BMW Sedan GCE8700 registered to him.

77. WILSON got out of his vehicle and Det. Collins identified herself as Detective Kim Collins with Lakewood Police. Det. Collins said she wanted to talk with him if he had a second. He said sure. Det. Collins asked to go inside, and he invited them instead onto his back porch. Det. Collins said we wanted to follow up with him about a case he was named in. Det. Russell had his belt with gun concealed and his badge visible. Det. Collins was in plain clothes with her gun, badge, handcuffs, and radio visible. At no time did either of them touch or draw their guns or radios. The following is a summary of what WILSON said to Det. Collins on that date.

78. WILSON said he's lived at that address since he bought the house in 2013. Det. Collins asked about STAPP who lived with him at 2080 Moore Street. WILSON said, "Yea. Yea… right." He said STAPP had a friend we later confirmed was A.H. He said that they moved in right after 9/11 because STAPP was working for United. WILSON was working for Colorado Outward Bound school for 27 years.

79. WILSON met STAPP on a plane flight, and they hit it off. He visited STAPP when STAPP was running United Operation in Portland Maine. STAPP lost his job due to what happened with the airlines after 9/11. He came out here and WILSON recommended STAPP for the CFO position with Colorado Outward Bound. WILSON said he went to Mexico and came back and doesn't know where STAPP is now. STAPP was supposed to help him in Mexico with his business, but STAPP walked away from it owing WILSON $40k. WILSON didn't have interest in keeping track of STAPP after that. When they were in Acapulco, WILSON broke even half the year and the other half the year he was spending $1k to keep it running. After 3 years he stopped  and STAPP was gone at that point.

80. WILSON stated that he uses andywww@earthlink.net. He's used that since the early 90's and he keeps it even though he pays monthly for it. Det. Collins told WILSON that his internet was flagged when he and STAPP were living together and that's why she was asking about the

computers and internet usage. Det. Collins said it was flagged for certain websites that aren't appropriate. WILSON replied, "Mmm hmm" in the affirmative.

81. Det. Collins asked what computer set up they had back then. WILSON said it's pretty much what he has now. He said he has Comcast/Infinity and a router. He said STAPP had a desktop and WILSON had a desktop. WILSON said he also had a laptop back then. He said A.H. didn't use his laptop and computer. He doesn't have those devices since they ran Windows '98. He has a Windows 10 machine now. He said he's kept a few older machines he's had a while. He took a bunch of stuff he had kept a few years ago to an electronics recycling event, including computers he had down in Acapulco. He had 10 computers down in Acapulco at the Internet Café. He said the café was high end with air conditioning and ergonomic furniture and space for customers to have some privacy.

82. Det. Collins asked if WILSON knew C.S. WILSON remembered C.S. was a teenager STAPP knew in Portland. He didn't think C.S. lived with them or lived nearby. He remembers C.S. in Portland Maine then said maybe C.S. moved to New Mexico. He said STAPP lived in New Mexico way back. He didn't know that C.S. had been arrested. Det. Collins asked if he knew about C.S. or STAPP having an interest in Child pornography. WILSON said, "Nope."

83. Det. Collins said C.S. talked about his time with WILSON and STAPP. Det. Collins said he point the finger at STAPP for teaching him about child pornography. WILSON replied unsurprised with positive affirmations of "mmhmm". Det. Collins said he mentioned that WILSON was well aware of them looking at child pornography. WILSON paused and said he knows he spent a lot of time on the computer and that's all he knows. He said maybe he was into porn. Det. Collins said C.S. said WILSON was the IT guy who taught them both about finding child pornography. WILSON scoffed and said, "No. That's crazy. IT guy? I worked for IT at the school. I was the IT guy at Colorado Outward bound." He talked about how his IT experience is better than most people and he gets it.

84. WILSON discussed spending time with S.K., and Det. Collins asked about S.K. getting into WILSON's porn collection on his computers. WILSON said, "Well I don't have porn on my computers so no." WILSON said he doesn't know what he had on his computers back then, and one of the things he used his computer for was to play computer games with S.K.

85. Det. Collins said there's a lot of concern about him and STAPP going down to Acapulco and having relations with boys down there. WILSON said, "uh huh" in the positive twice. He said it's well known for that (twice). Det. Collins asked if WILSON has had relationship with boys in Acapulco. WILSON said, "Boys that were older than 16 or 17 years old." He said one of the reasons he closed that business was there was this guy. He backed up his thought and said there was a significant bust of Americans and Canadians where the claimed they had some party with too many underage boys down there. They arrested them and put them in jail in Mexico and then they had to prove they were innocent. Then someone came to the internet café and accused WILSON and STAPP of having some role in the situation, which WILSON says was not true but may have been the reason STAPP left. WILSON stayed there two years and tried to pursue his legal remedies and it wasn't getting him anywhere.

86. Det. Collins said STAPP had a prepubescent boy like 9 or 10 that he mentored over the years from down there. WILSON didn't know about that. Det. Collins said there are young boys down there that are extremely poor and beg for sex for money. Det. Collins clarified like 10, 11, or 12 years old. Det. Collins asked if he ever saw STAPP do anything like that and WILSON said, "No. Not that young." He said STAPP would go for 16, 17, or 18. WILSON said, "10 years old,  no."

87. Det. Collins said, "What if I were to say there is a video out there of you with a younger boy." He said he'd like to see it. Det. Collins asked if it was possible that they filmed themselves having sex

down there. He said no. Det. Collins asked about just filming the boys. WILSON said, "Yea, filming the boys, yea, taking pictures out at the beach." Det. Collins asked if there were images where they're naked or genitals showing. WILSON replied, "Well, maybe." Det. Collins asked about the boys doing anything sexual with each other. He said he didn't think so. His recollection was they would say they're not gay. He said there were gay people down there and he went to gay weddings. He said it's crazy down there. He knows in Acapulco you can get anything. He said that it's extreme in that sense. He said he doesn't know first-hand, but he got the feeling anything you wanted you can get. He said, "Babies… which (inaudible) terrible."

88. Det. Collins asked the context of him filming the boys naked. He said he didn't think he said he filmed them naked. He said he didn't have any images. Det. Collins said there are people saying he had photos and videos of naked boys with darker skin on his computers.

89. Det. Collins said she was concerned about STAPP. Det. Collins said he adopted one of A.H.'s kids and sexually assaulted them for years when they were young. WILSON said, "That's awful." Det. Collins said that she wants to make sure STAPP is held accountable. Det. Collins said I'm trying to understand if there's more to STAPP that WILSON knows about. Det. Collins said STAPP definitely has a preference for little boys. WILSON said, "Little boys, little little boys?" Det. Collins said she knows they could get that in Acapulco and asked any insight he had into STAPP. WILSON said that was pretty much it and Det. Collins is telling him more than he knew before. He said he knew STAPP liked teenaged boys but that was definitely 16 or 17. WILSON said, "I mean I kinda like them too but it's not legal for one thing and two, I mean the idea of having sex with someone who's pre-sexual seems pretty sick. Whether it's boys or girls, it's crazy. But there are people who do. I'm not naïve to that. The people who are into weird shit, good grief."

90. Det. Collins asked whether WILSON ever masturbated to images or videos of teenage boys. WILSON said, "oh yea. Not babies, not little boys." Det. Collins asked where on the Internet he gets his pornography. He said it's not even pornography. He said you can go on Instagram and get all kinds of pictures of pretty boys. He said there's a ton of gay porn sites on the internet and you can go sample then they want you to pay $6.95 or $7.95 or they'll give you a deal for a year. That stuff he's not into.

91. Det. Collins asked WILSON about NAMBLA. He said he's gone to NAMBLA and it's pretty generic. He has people writing about what they believe. People were writing about experiences they've had. He thinks it's a lost cause if they think they'll influence the world. He said he might have signed up but never got anything from them.

92. Det. Collins asked WILSON about "Boybliss". He said he didn't know anything about it. He asked what it was and Det. Collins said it's another site for child pornography. He asked if that's a trading site or something. Det. Collins asked if he's gone to other trading sites. He said he doesn't like to go to trading sites because he doesn't like to trade. He has run into people where they get a hold of you and they want to trade. He said he doesn't know who they are and what they're talking about. When he pursued it a little bit, it turns out to be a bait and switch thing.

93. Det. Collins asked about WILSON downloading images and he said he's downloaded stuff. Det. Collins asked if he's ever downloaded something of anyone under 16. He said he's downloaded things he's looked at and said I don't want this and deleted it. WILSON said he's not into it and it's sort of disgusting stuff to have. Det. Collins asked what that was. He said he doesn't know but there's been some cases where there's someone who has a kid clearly under 12,13, or 10 and he's not into it.

94. Det. Collins asked when the last time he got a file he didn't want and deleted it. He said he didn't know because it's been a long time since he downloaded anything. Det. Collins asked if he meant

years or months. He said within the last year or 6 months ago. Det. Collins asked where he goes to do that when he's had to delete stuff.

95. Det. Collins asked if it's the dark web, Tor, or Bit Torrent. He said he has used Tor Browser. He said maybe not exclusively because sometimes it's painfully slow. A lot of times he will run a VPN and VPN is funny because you log in and it thinks you're in France. VPN is great for privacy but an inconvenience logging into banks etc. He does that on his laptop. Det. Collins asked if he's done that from his cell phone and he said no because his vision is so bad, he can't see anything on his cell phone. He said he'll do it if he has to.

96. WILSON confirmed his phone number is 720-971-8722 (same number Det. Collins attempted to contact him as a UC 14yo boy persona).

97. WILSON said he's a closet gay guy, he's been married twice, and he doesn't associate with the gay culture. He's attracted to younger guys, if they are sexual. They can't be kids or babies, which WILSON explained to be "fucked up." Det. Collins asked about 13- to 15-year-olds. He said well, they don't know what they're doing.

98. Det. Collins asked about Acapulco and whether the kids had ID's. He said no. He remembers one kid propositioning him. The kid was maybe 14, maybe 17. He said the kid followed him and he had him in his hotel room. The kid was really destitute. The kid took off his pants, laid back on the bed, spread his legs. WILSON thought, "Oh my god." He thinks the kid was stoned on glue and WILSON took his clothes outside and his laundry outside, hung them out to dry. The kid went to sleep. When he woke up, he doesn't remember if he fed him or not. He just told him to go. WILSON 's liked doing things for those kids. The ones that were really destitute and out there for money, he could give them money but they'll just go buy paint thinner or glue. He would try to give them a little love.

99. Det. Collins asked about taking photos of them but not actually doing something to them. WILSON said he has photos of them at the beach and hanging out drinking beer and smoking dope. WILSON said to the ones he knew the best that he couldn't smoke dope and then drive them somewhere. He didn't want to get arrested.

*Search Warrant for 1355 Otis Street, Lakewood, Colorado*

100. On 7/22/21, Det. Collins obtained a search warrant for 1355 Otis Street Lakewood, Colorado Court case number 21-1088 signed by Jefferson County Judge Wheeler.

101. On 7/27/21, at 1000hrs, Det. Collins executed the search warrant at 1355 Otis Street. When Det. Collins explained to WILSON that they had a search warrant for the house, WILSON stated in substance, "You'll find everything you're looking for in there" or "you'll find it all in there."

*WILSON's Statement to Det. Collins at the time of the Search Warrant Execution*

102. Det. Collins and WILSON sat together in an unmarked police vehicle. Det. Collins explained to WILSON that he wasn't in custody and that he was free to go except to go back in the house while they were executing the search warrant. Det. Collins read WILSON his Miranda rights, and WILSON agreed to talk. The following is a summary of WILSON's statement.

103. Det. Collins asked WILSON to help her understand what he was talking about earlier. WILSON said, "Well you're going to find my collection of pornography. And uh it includes underaged boys." He said they may find something that "goes way down age wise." He said if he finds images that young, he tries to delete it. He said we'll find ages 14, 15, and 16 at least. That will be on CD-

ROMs, DVD's, and hard disks/drives in the back bedroom of the house. He said it's all in there and it's an obvious computer set up.

104.   WILSON explained the last time he got something off of TOR. WILSON said today he was downloading "Xvideos" mainstream porn. He said it's been quite a while like 2 to 3 months since he got something off of TOR. On TOR, he gets his 14-year-old images from "Boyvid" or "boy videos". WILSON explained it's a website you can download stuff and upload stuff but he's never uploaded stuff. He said he's done that every day, then corrected himself that he's done that "a lot". He admitted to doing that "at least weekly." He's downloaded some things multiple times. He said, "I guess you call it a sickness or something. I download the stuff and hardly ever look at it. I mean you're going to find terabytes of stuff because there's duplicate and triplicates."

105.   WILSON said it's organized by subject matter and he's the one who organized that. He said the website was organized but he organizes it by putting it in the folders he wants to put it in. His main preference is ages 14-16, boys and "boys of color like Mexican or Asian. Largely because they look younger than they are in many cases. I like oral sex. That's about the extent of it. I'm not into anal." He said there's a lot of anal out there and he stops watching the video if it goes to that. Det. Collins asked if he masturbates to the pornography. He said, "Yes and No. It's gotten to be where it's almost less arousing for me. So I just look at it but you know maybe if I look for a long time I'll masturbate to it." He agreed it's a sexual thing to watch it.

106.   WILSON said he created images in Acapulco in 2002. He used a video camera and a digital camera. He said they were "street boys" ages 14-16. He said he'd ask how old they were, and they would say "trece or quatorce anos". WILSON said he did not pay the boys. He remembered boys saying he could suck their dick and pay them but he didn't pay them or do anything with them. He said he would buy the boys he befriended clothes and get to know their families. He said it wasn't all about sex. They would go to the park or amusement park, and WILSON enjoyed doing that. He said he has lots of pictures of boys being boys at the beach doing stuff and then they figured out "what the deal was" and would pull their pants down. He would take pictures. The boys would be masturbating and rarely performing sex acts on each other. WILSON said these kids wouldn't perform sex acts on him but he would masturbate them. He said it feels good, they like it, and it's sexual for WILSON. WILSON enjoyed giving them pleasure. WILSON explained that on his computers, there is not one specific folder those images are in.

107.   WILSON said he didn't know what was going to transpire after we talked last week. He felt like he fucked up and was naïve and should have figured something was going to come out of this. He started slowly deleting things. He said there's a hell of a lot of it and started trying to delete things. He didn't wipe drives or format drives, which doesn't really erase things anyways. He wanted to keep some of the pictures of kids that aren't sexual or pornographic. He was looking at some of them and that here they are, sitting around in my apartment and they're nude, and he asked himself if that was pornographic. He was thinking through if he should get rid of those.

108.   Det. Collins asked how many times he's masturbated young teen boys in Acapulco. He said not that many times, he was down there a few months, came back, went back again. He focused on one boy. He said there was a month he had interactions with a handful of boys where he realized it was stupid because he really liked one kid and wasn't going to see the other boys. He had sex (oral or manual) 10 to 12 times with 4 to 5 boys in that month.

109.   He then devoted his attention to one boy who's 30 years old now named J.A.G.V., who now lives in Vista California. WILSON had oral sex with J.A.G.V. starting at 13 years old. WILSON last physically saw J.A.G.V. in 2012. WILSON believes J.A.G.V. was in the US in 2005 and 2006 and WILSON had sex with him "a little". That was at the Teller Street address in Colorado where he was managing the apartments. WILSON thought J.A.G.V. was 16 or 17 then. In Acapulco,

WILSON took videos of J.A.G.V. playing on the computer. writing a letter to his girlfriend, and singing.

110.   WILSON explained that he hired  and helped J.A.G.V. pay for a coyote because J.A.G.V. wanted to be in the states and WILSON thought it would be great to help J.A.G.V. out and have him with WILSON. J.A.G.V. had issues adjusting. He got a girl pregnant and started hanging out with the wrong kids and got into trouble. J.A.G.V. went to Georgia with other people he knew. That didn't work out and he came back. WILSON said he can't have him at the apartments. WILSON rented an apartment for J.A.G.V. They weren't having sex then. It got to the point where it didn't appeal to WILSON that much and he just cared for him.

111.   J.A.G.V. got arrested in 2007 or 2008 but WILSON decided not to bail him out because he thought he'd just end up in big trouble eventually. WILSON thought that J.A.G.V. was a young small good-looking guy and won't fare well in prison.

112.   WILSON explained that ICE took J.A.G.V. back to Aurora and processed him and took him back to Mexico. WILSON had been supporting him financially and went down to see him in Cabo around 2012. He stayed with his wife, son, and father. They went to the prison every day because J.A.G.V. got arrested for an assault incident in Cabo. It cost WILSON $40,000 to bail him out. J.A.G.V. strung WILSON along doing drugs, getting in trouble, and having stories. They've broken off a few times. He loves the kid and felt he was helping him. J.A.G.V. was a street kid who was huffing glue. In Cabo, J.A.G.V. got into drinking, marijuana, cocaine then J.A.G.V. would get religious. WILSON thought J.A.G.V. was born in September of 1989.

113.   In 2005, the coyote met J.A.G.V. at the border and drove him across to LA. WILSON flew to LA, rented a car, and drove J.A.G.V. back up to Colorado. He did a one-way flight and car rental. J.A.G.V. didn't have identification. They went to the Mexican Consulate trying to get him an ID and it didn't work. He said the people downtown could make ID's but they were obviously fake.

114.   WILSON talked to J.A.G.V. last week. Sometimes they email. They text. His name is under "Chucho" on his phone which means "Dog" but not in a derogatory way. He said it means dog like puppy. WILSON hasn't brought anyone else over. He brought J.A.G.V. over in 2005. It's gotten a lot more expensive. It cost WILSON $1,500. He said now people are paying thousands of dollars now with how things are at the border.

115.   When J.A.G.V. was in Lakewood, WILSON wouldn't share J.A.G.V. WILSON said he doesn't know anyone else here that he would do that with either. WILSON quickly decided that he's a "monogamous child molester." He knows his family. J.A.G.V. has 4 boys and WILSON has met his son. WILSON denied doing anything sexual with J.A.G.V.'s son. WILSON would be surprised if J.A.G.V. did anything sexual with his kids.

116.   WILSON told Det. Collins that he's never had any physical contact that would be considered anywhere near inappropriate with anyone except J.A.G.V. when he was here in the U.S. He hasn't had sex with any person other than J.A.G.V. since 2005. If you take Acapulco and J.A.G.V. out the of picture, then hasn't had sex since his divorce in 1996. Det. Collins asked if that includes masturbating a boy. He said yes, it includes not doing that.

117.   Det. Collins asked what has prevented him from doing that in Colorado outside of J.A.G.V. WILSON said fear of getting himself into "deep shit trouble like I am now, seemed like a good way to do it." Also, WILSON thinks kids these days if they get involved in that are damaged by that. "Whether it's damage because I damage them, or because people treat them like they're damaged, I'm not sure I know the answer to that. I don't want to hurt a kid. I really don't."

118.   Det. Collins asked about Colorado Outward Bound. WILSON did an adventures course as a director. He was the support operator and course director. He rode the oar boat with the gear. The kids were 14-16 in the paddleboats with instructors. He had no interactions with the kids that was inappropriate and had little interaction with the kids. WILSON said he only worked one course in the field in 1975. He worked several courses in New Mexico. He denied any contact with students.

119.   J.A.G.V. was 13 or 14 when WILSON first met him. WILSON saw himself as a father figure. J.A.G.V. called him "Papa." WILSON told J.A.G.V. that the police had talked to him. He didn't tell him much, just that he was interviewed by police and he wasn't sure what was going to happen. WILSON did almost exclusively perform oral sex on J.A.G.V. WILSON said that J.A.G.V. has not done anything on WILSON other than touching WILSON. WILSON said that's not really true and they've done "fropping" where you rub your penises together masturbating. They've done that a few times. WILSON said that's interesting because J.A.G.V. is pretty passive.

120.   WILSON said he is circumcised and doesn't shave. He has but doesn't know the last time he did. He said in the images we'll see his pubic hair won't be shaved. J.A.G.V. got tattoos in prison. He said Det. Collins may see later images where he has tattoos on his arms.

121.   Det. Collins brought up Bob STAPP. WILSON said STAPP has a propensity for boys that are younger than what WILSON is interested in. STAPP practices anal sex with the boys. WILSON thinks he has a prior record. One reason WILSON didn't want to continue to associate with STAPP was WILSON didn't like the way STAPP treated the boys. In Acapulco, STAPP would have a boy for a while and then get bored with him and move onto another boy. WILSON estimated the boys were the same age or younger as the boys that WILSON was interested in. WILSON didn't monitor what STAPP was doing. STAPP told WILSON he was having anal sex with the boys.

122.   Det. Collins asked if C.S. had a sexual relationship with STAPP. WILSON didn't know. WILSON recalls that C.S. was into boys, too. STAPP borrowed his video camera one time when he went down there because of what he was into. WILSON doesn't recall STAPP showing him what he did with the camera. He said he can't say it didn't happen once that he showed him something, but he hasn't thought about it much.

123.   Det. Collins said C.S. described the tower of child porn. WILSON said the physical computer part is gone but that I'll find a lot of porn. Det. Collins said C.S. taught him how to find child porn and described it. WILSON said he can't deny it. He doesn't recall much about C.S. He was looking through stuff and found photos of C.S.'s birthday party on Moore Street. WILSON didn't even remember C.S. being at Moore Street but obviously he was at the house. WILSON remembered C.S. in Portland and New Mexico.

124.   Det. Collins asked about STAPP bringing a boy from Acapulco up to the US. WILSON didn't think so. WILSON explained J.D. is a boy STAPP met in Acapulco years ago. When they'd go down there, they'd stay with J.D., his wife, his little girl, and his wife's mother. They had a quinceanera video somewhere of that. STAPP had a sexual relation with J.D. when J.D. was younger, years before he knew STAPP. WILSON informed Det. Collins that J.D. died in a car accident in Oklahoma.

125.   Det. Collins asked what the one thing he's done related to children and teens that he most regrets. WILSON thought for about 30 seconds and replied, "Well it sounds selfish but I regret getting into trouble." He said because he's a consumer of child pornography that he enabled that genre of activity that hurts children. He said the truth is that the stuff he's created he's never given anyone, posted it, or traded it. He said, "not even Bob [STAPP]. It is mine." WILSON said the boys asked if he takes their picture if it will be on the Internet and he said it's not. He said as much

trouble as he's in for what he's done, he keeps his word. He lied about some things last week hoping he'd dodge the bullet.

126.   Det. Collins asked about TOR and communities you give child porn to get into. WILSON said he didn't know what they are. He's downloaded from places you have to become a member. He said if you came across material, you could get it. The search function required you to register with an email address. Over time, they asked you to contribute. He didn't upload anything. His email was his Tutanota account. The email is bl_a@tutanota.com. This email has end to end encryption and their website says they can only read metadata for sender email address, recipient email address, and date of the email. They encrypt all data stored in your mailbox (contacts, emails, email signature, inbox rules, invoice data, payment method, certificate, and private keys of your own domains). When sending an email, Tutanota encrypts subject, content, and attachments automatically. He said it's a free service.

127.   WILSON explained that he did not use his paid service at andywww@earthlink for child pornography. Det. Collins asked about uploading to a cloud-based service. He didn't think so. He may have looked at child pornography on his phone but doesn't like keeping things on his phone. WILSON deactivated the phone immediately when it got stolen recently. The Tutanota account is not on his phone. He only uses that on his computer.

128.   He said there's a desktop, two laptops, and external hard drives attached to the various computers. He estimated there were about 8 external hard drives. He said they all have child pornography. He said there are separate computers with an in-home network so they all can access the Internet. The two older Windows machines he doesn't use as much.

129.   WILSON said he thinks he brought everything into the office. Det. Collins asked about the VHS boxes in the garage. He said what's in there may be VHS videos that he doesn't think are illegal but he's not a lawyer. Det. Collins asked about any naked kids and he said no. He thinks he had a video from fun-de-flex flexing with their shirts off. It was generic stuff he likes. Det. Collins asked if he transferred things from VHS to DVD's and he said no. He got videos from his camcorder.

130.   He said there were thumb drives in the office. There's a tablet there and another laptop in the living room. He didn't think there was pornography on either of those. He said at one point or another there may have been. He said it's a Panasonic laptop and a Samsung tablet. WILSON thought there may be some items with child pornography and his handgun in the locked box in the garage that is a toolbox for his truck.

131.   He talked about not liking the anal video and there being violent porn from Russia called Thieves Punishment. He really doesn't like seeing kids hurt and deleted it right away. WILSON gets excited by people playing bondage but it has to be soft core porn. WILSON likes oral sex, fondling, and loving relationship. WILSON said if he thinks they're 13 and they're enjoying what they're a part of, that is the youngest that is still pleasurable and arousing for him. He said they'll have to be into it and at a sexual age which is basically 13. He said some 12 year olds mature sooner. He's got lots of pictures of little boys with no pubic hair and clearly less than 13 but a lot of them are more naturalist photos and he's looking for nice looking body, pretty face, and maybe they're doing something fun like cartwheels. WILSON said he has some porn from nudist colonies. WILSON doesn't consider that pornography just because someone is nude. When WILSON says he has child pornography in which kids are engaged in sex acts.

132.   WILSON stated that he was going through stuff on his computers thinking he should get rid of it. He thought he could round it all up and get it so it could never be discovered. Part of him wanted to keep a lot of the stuff and good memories. He was taking notes of things he could get rid of the pornographic stuff. That's what he was working on. He said even if Det. Collins never came back

he would do that but Det. Collins did come back. He didn't know if he would see us again if ever and wanted to get rid of it. He was prioritizing other things like putting shocks on his Eurovan. Det. Collins asked about his car being packed up with a lot of stuff. WILSON said he got an inflatable kayak in the trunk to get it out of the way, he has a lot of clothes he's been meaning to take to the arc. The Eurovan has camping stuff, sleeping bags, and clothes. He tries to have it equipped to go.

133.   WILSON explained the encrypted containers have passwords. He said the password is "alwwbi1951" which stands for Andrew L WILSON was born in 1951. WILSON said what we'll find on the DVD's and hard drives is the same stuff as on the computers but encrypted in containers. WILSON said we'll find a lot of stuff that he'll be really screwed.

134.   Det. Collins asked what he's most worried about us finding out about. He said his secret life that he hasn't told his friends. He was going to tell his friends. WILSON said he feels like he's going to get arrested and doesn't know what that means. He knows he's had this secret life that basically aside from Bob STAPP and C.S. no one knew about it. He has a lot of friends who will be shocked but he has to come clean. He feels really awful and bad about it. He doesn't know how people will react. He said he doesn't know how his sister and nephew who will be 30 in November will react. He's in Oakland and his sister is in Seattle. His nephew is the ultimate beneficiary of the trust. Det. Collins asked if anything sexual occurred within his family and his nephew or sister. He said no. WILSON said he was hands off in the United States. He has this pornography but physically was hands off.

135.   He said he made some bad decisions in Mexico and tried to stay away and be with J.A.G.V. because he really loved him. WILSON said the dirt that J.A.G.V. has on him is what he told us. He thinks his wife may suspect and knows they have some sort of relationship. He doesn't know what extent that is. J.A.G.V.'s kids call him grandfather because J.A.G.V. calls him, "Papa."

*Seizures pursuant to the Search Warrant*

136.   The following items were seized by the Lakewood Police Department from WILSON's home pursuant to the above-described search warrant:

- L21026535 / Dell Computer Tower
- L21026536 / EXTERNAL HARD DRIVE / ZFL0H55E
- L21026537 / EXTERNAL HARD DRIVE / ZFL0H024
- L21026538 / SONY VAIO LAPTOP/ 283602303510876
- L21026539 / EXTERNAL HARD DRIVE / MH0URZ5B
- L21026540 / EXTERNAL HARD DRIVE / HD0D7UMC
- L21026541 / EXTERNAL HARD DRIVE /17182153041600556
- L21026542 / EXTERNAL HARD DRIVE / MS1JK5EK
- L21026543 / EXTERNAL HARD DRIVE / Z4Z7023N
- L21026544 / EXTERNAL HARD DRIVE / 2CAV03ZP
- L21026546 SONY VAIO LAPTOP / 275449353000540
- L21026548 / EXTERNAL HARD DRIVE / UNKSN
- L21026550 / EXTERNAL HARD DRIVE / L600DQKG
- L21026552 / EXTERNAL HARD DRIVE / 01121362
- L21026554 / EXTERNAL HARD DRIVE / S03WJ10X422664
- L21026555 / EXTERNAL HARD DRIVE / UNK
- L21026557 / EXTERNAL HARD DRIVE / D5CA6ZWA

- L21026558 / EXTERNAL HARD DRIVE / TB04W67C
- L21026561 / EXTERNAL HARD DRIVE MISC BOX COMPUTER ITEMS IN BOX
- L21026562 / EXTERNAL HARD DRIVE / 71GPD13VB
- L21026563 / EXTERNAL HARD DRIVE / W4Z49KEZ
- L21026564 / EXTERNAL HARD DRIVE / Z4Z0F9HP
- L21026566 / EXTERNAL HARD DRIVE / WCC4MFDV2UYS
- L21026568 / PANASONIC TOUGHBOOK / 00045675249072
- L21026570 / EXTERNAL HARD DRIVE / K80JS3MC
- L21026571 / EXTERNAL HARD DRIVE / 17182153041600557
- L21026572 / EXTERNAL HARD DRIVE / Y306VV9E
- L21026574 / SAMSUNG CELL PHONE / R38JB0JPRXU
- L21026575 / SAMSUNG GALAXY TABLET / R52JALMF1GR
- L21026576 / BLK ANDRIOD CELL PHONE / KTU84PM919UVST9A1
- L21026578 / SAMSUNG CELL PHONE / SGHTG99
- L21028092 / MAXTOR HARD DRIVE / 664204801501
- L21028093 / MAXTOR HARD DRIVE / K80JH7RC
- L21028094 / MAXTOR HARD DRIVE / K80FNLAC
- L21028095 / MAXTOR HARD DRIVE / K60BA01C
- L21028097 / IBM DESKSTAR HARD DRIVE / A4CUYE0A
- L21028104 / LG CD/DVD CASES
- L21028105 / CD/DVDS
- L21028108 / 2XMED CD/DVD CASES
- L21028118 / ROKU 4660X2 ROKU ROUTER / CK48A5690084
- L21028119 / LG SPINDLE CD/DVDS
- L21028121 / SM SPINDLE CD/DVDS
- L21028123 / MED CD/DVD CASE
- L21028124 / SM SPINDLE CD/DVDS
- L21028126 / CD/DVDS
- L21028128 / CD/DVDS
- L21028132 / DVDS
- L21028134 / PANASONIC DC-ZS80-PANASONIC DIGITAL CAMERA / WS0AA002362
- L21028135 / ORICO HARDDRIVE ENCLOSURE
- L21028136 / SEAGATE HARD DRIVE / ZCT2XJYX
- L21028137 / SEAGATE HARD DRIVE / ZCT2X7EC
- L21028139 / 2XDVDS
- L21028140 / SONY REWRITABLE DRIVE
- L21028142 / MOTHER BOARDS
- L21028143 / RAM /
- L21028145 / MED SPINDLE CD/DVDS
- L21028146 / MULT FLOPPY DISCS
- L21028147 / BOX W/FLOPPY DISCS
- L21028148 / SM CD/DVD CASE

- L21028149 / ZIP DRIVE AND 2 CASES
- L21028152 / ZIP DRIVES
- L21028153 / IOMEGA ZIP WRITER / SSB62430H4
- L21028157 / IOMEGA DISKS
- L21028159 / OLYMPUS CAMERA / 4021668
- L21028160 / SD CARDS
- L21028164 / VHS TAPES
- L21028166 / MAXTOR HARD DRIVE / L603FACH
- L21028168 / MAXTOR HARD DRIVE / L40YW48G
- L21028170 / ZIP DRIVES
- L21028172 / VIDEO MINI CASSETTES
- L21028173 / COMPUTER PARTS
- L21028174 / CD/DVDS
- L21028175 / SONY SUPER STEADY SHOT / 41480
- L21028176 / SONY CAMERA / 0845489
- L21028178 / SONY CYBER SHOT CAMERA / 1092092
- L21028179 / SONY CYBER SHOT VIDEO CAMERA / 1432374
- L21028180 / SD CARDS AND CAMERA ACCESSORIES
- L21028181 / CD/DVDS IN HARD CASE
- L21028182 / MED SPINDLES CD/DVDS
- L21028183 / CD/DVDS
- L21028184 / 2 BOXES OF FLOPPY DISKS
- L21028187 / VHS TAPES IN BOX
- L21029380 / DISC- RECORDING
- L21029382 / DISC- RECORDING
- L21029791 / BLUE TOTE-SLIDES, VIEWER, PICTURES
- L21029793 / BLUE TOTE-SLIDES, SLIDE SORTER

137.   Lakewood Police observed that WILSON had a car packed with sleeping bags and items he would need for a trip. His passport was laid out. WILSON said he has about $3,000 in the bank and a lot more in assets he could sell off. WILSON was arrested and transported to Lakewood Police Department to be processed. He was lodged at Jefferson County Jail.

*International Travel by WILSON and STAPP*

138.   On or about September 1, 2021, your affiant checked a DHS database and located international travel records which shows that STAPP and WILSON traveled via air to Acapulco, Mexico on December 5, 2001. Records show that WILSON traveled via air multiple times between the U.S. and cities in Mexico including Cabo San Lucas, Huatulco, Ixtapa, Acapulco, and Puerto Vallarta from 2001 through 2019. WILSON traveled multiple times via land and seaports between the U.S. and Mexico starting in 1996 through 2021. Records show that STAPP traveled extensively from 2001 through 2018 to Mexico and other countries in Europe, Central America, South America and the Middle East.

**INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND CREATE,
POSSESS, RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY**

139. Based on my previous training and experience related to investigations involving child
pornography and the sexual abuse of children, I have learned that individuals who create, possess,
receive, distribute or access with intent to view child pornography have a sexual interest in children
and in images of children. Based upon my knowledge, experience, and training in child
pornography investigations, and the training and experience of other law enforcement officers with
whom I have had discussions, there are certain characteristics common to individuals involved in
the receipt and collection of child pornography:

A. The majority of individuals who create and collect child pornography are persons who have a
sexual attraction to children. They receive sexual gratification and satisfaction from sexual
fantasies fueled by depictions of children that are sexual in nature.

B. The majority of individuals who create and collect child pornography collect sexually
explicit materials, which may consist of photographs, magazines, motion pictures, video
tapes, books, slides, computer graphics or digital or other images for their own sexual
gratification. The majority of these individuals also collect child erotica, which may consist
of images or text that do not rise to the level of child pornography but which nonetheless fuel
their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous
images of minors are often found on media containing child pornography. Such images are
useful in attempting to identify actual minors depicted in child pornography images found
during the execution of a search warrant. In certain cases, such images may also assist in
determining the origins of a particular child pornography image or series of images.

C. The majority of individuals who create and collect child pornography rarely, if ever, dispose
of their sexually explicit materials and may go to great lengths to conceal and protect from
discovery, theft, and damage their collections of illicit materials. They almost always
maintain their collections in the privacy and security of their homes, cars, garages, sheds, and
other secure storage locations, such as in a digital or electronic format in a safe, secure, and
private environment, including in cloud-based storage online or on their person.

D. The majority of individuals who create and collect child pornography often seek out like-
minded individuals, either in person or on the Internet, to share information and trade
depictions of child pornography and child erotica as a means of gaining status, trust,
acceptance and support. This contact helps these individuals to rationalize and validate their
deviant sexual interest and associated behavior. The different Internet-based vehicles used
by such individuals to communicate with each other include, but are not limited to, e-mail, e-
mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

E. The majority of individuals who create and collect child pornography maintain books,
magazines, newspapers and other writings, in hard copy or digital medium, on the subject of
sexual activities with children, as a way of understanding their own feelings toward children,
justifying those feelings and finding comfort for their illicit behavior and desires. Such
individuals rarely destroy these materials because of the psychological support they provide.

F. The majority of individuals who create and collect child pornography often collect, read,
copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of
persons who have advertised or otherwise made known in publications and on the Internet
that they have similar sexual interests. These contacts are maintained as a means of personal
referral, exchange or commercial profit. These names may be maintained in the original

28

medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

G.  Based upon training and experience, your Affiant knows that persons in engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography.  Likewise, your Affiant knows from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

H.  Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses.  Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.


## CONCLUSION

140.   Based on the investigation described above, probable cause exists to believe that inside the Device(s) (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Sections 2252(a)(1), (2), and (4) and 2252A(a)(1), (2), (3), and (5) (described on Attachment B).

141.   I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


_s/Darrell Franklin_____
Darrell Franklin, Special Agent
Homeland Security Investigations


SUBSCRIBED and SWORN before me this __5th__ day of October 2021.

HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE


Application for search warrant was reviewed and is submitted by Melissa Hindman, Assistant United States Attorney.

29